**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> JULIAN RICARDO CHACON, ) <br> ) <br> Defendant. ) | Case No.   2:08-cr-00059-JCM-GWF <br><br> **FINDINGS & RECOMMENDATIONS** <br><br> **Defendant's Motion to Suppress Evidence - #24** |

This matter is before the Court on Defendant's Motion To Suppress Evidence (#24), filed on December 29, 2008 and the Government's Response to Defendant's Motion To Suppress (#28), filed on January 20, 2009.  The Court conducted an evidentiary hearing in this matter on March 5, 2009.

**FACTUAL BACKGROUND**

The indictment in this case charges Defendant Juan Ricardo Chacon with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2).  *See Indictment (#1)*, filed on March 12, 2008.  This indictment arises out of a police stop of Defendant's automobile on July 22, 2006 and the subsequent search of the vehicle trunk which resulted in the discovery of a Sig Sauer 9 millimeter pistol.  Defendant allegedly made statements to the police officers acknowledging that the pistol belonged to him.  According to the indictment, Defendant Chacon had previously been convicted of felonies in 2000 and 2004 which made it unlawful for him to possess a firearm.

The subject incident began on July 22, 2006 at approximately 11:37 a.m. when an individual called the Las Vegas Metropolitan Police Department's emergency "911" number.  The recording of the 911 call was played during the evidentiary hearing.  The caller told the 911 dispatcher: "I just saw a guy put a woman in the trunk of a Cadillac."  The caller stated that he observed this occur in a store parking

lot located at Cheyenne and Las Vegas Boulevard. The caller stated that he was following the Cadillac, which he described as a tan late 1990's model STS. He also read the license plate number of the vehicle to the dispatcher. The caller described the driver of the Cadillac as possibly a Hispanic male in his 30's, of medium build and wearing dark colored jeans and a black and green or blue and green shirt. He described the woman as a white woman of medium to medium heavy build, wearing white or blue shorts and a tank top. The caller also provided the dispatcher with his first name and telephone number and a description of the vehicle he was driving. As the call continued, the caller told the dispatcher that the Cadillac had pulled into the parking lot behind a 7-Eleven store located at Cheyenne and Lamb Boulevard. The caller stated that he had passed that location and was no longer observing the Cadillac. The police dispatcher broadcast a "priority zero" call over the radio notifying officers that an individual has seen a male put a female in the trunk of a vehicle. The dispatcher provided the description of the Cadillac and its license number and stated that it had pulled into the 7-Eleven station at Cheyenne and Lamb.

Las Vegas Metropolitan Police Officers Anthony Rhodes and Eric Carlson testified at the evidentiary hearing. Officer Rhodes testified that a "priority zero" dispatch call is the highest level priority call. He responded to the call and was the first police officer to arrive at the 7-Eleven store. Upon arriving, he observed the Cadillac parked in the front of the 7-Eleven station near the gas pumps. Officer Rhodes testified that he stopped his patrol vehicle behind the Cadillac and activated his emergency lights and siren to notify the driver of the Cadillac that the police were behind him. As he did this, other officers arrived on the scene.

Officer Rhodes testified that because the dispatch report involved a possible kidnaping, he and the other officers conducted a "felony stop." He and other officers ordered the driver of the Cadillac, who was subsequently identified as Defendant Chacon, to exit the vehicle. The officers had their firearms drawn and pointed at the Defendant. Officer Rhodes ordered Defendant to raise his hands and walk backwards to the patrol vehicle. Once the Defendant was near him, Officer Rhodes holstered his firearm and placed Defendant in handcuffs and performed a pat down search of his person. Officer

. . .

. . .

2

Rhodes testified that he and Officer Eric Carlson then left Defendant with Officer Carlson's partner, Officer Urena, while they proceeded to the vehicle trunk.[1]

Upon opening the trunk, the officers observed a female lying inside. The female was talking on a cellular telephone. The woman, who was subsequently identified as Melissa Buterbaugh, exited the trunk and was then escorted by Officer Urena to his and Officer Carlson's patrol vehicle located approximately 30 feet from where Defendant was standing by Officer Rhodes' vehicle. Officer Rhodes testified he did not speak with the woman at that point. He acknowledged on cross-examination, however, that he took the cell phone away from Ms. Buterbaugh and that she became upset at this. Ms. Buterbaugh asked why he took her cell phone away, and stated that she was talking to her father and that she had not done anything wrong. Officer Rhodes testified that the woman was also placed in handcuffs.

Officer Rhodes testified that he then obtained Defendant Chacon's identification from him. He advised Defendant Chacon of his Miranda rights because he was suspected of possible kidnaping. According to the Metropolitan Police Department Dispatch Log, Officer Rhodes "Mirandized" Defendant Chacon at approximately 11:44 a.m. *Defendant's Exhibit "I."* Defendant acknowledged that he understood his rights and he agreed to speak with Officer Rhodes. After Officer Rhodes explained why the officers were there, Defendant Chacon stated that there was no kidnaping and that the woman had voluntarily gotten into the trunk. Officer Rhodes then asked Defendant Chacon for permission to search the vehicle. He testified that Defendant responded by stating "go ahead."

Officer Rhodes testified that upon obtaining Defendant's consent to search the vehicle, he looked into the open trunk of the Cadillac. He observed a handgun in the trunk in plain sight. He advised Officer Carlson that there was a gun in the trunk. The Dispatch Log entry at 11:59 a.m. indicates that a gun was found in the trunk. *Defendant's Exhibit "I."* After searching the trunk, Officer Rhodes stated that he searched the backseat area of the vehicle. He found a bag in the center backseat armrest/console

---

[1] Officer Rhodes testified that several other police officers arrived at the 7-Eleven shortly after he arrived on the scene. In addition to Officers Rhodes, Carlson and Urena, the unit log lists seven other officers who were present at the scene during the course of the stop. *Defendant's Exhibit "K."* According to Officer Rhodes' and Officer Carlson's testimony, other than Officer Urena, these other officers do not appear to have been actively involved in the incident once the Defendant was handcuffed.

that was later determined to contain methamphetamine. He also observed that there was an opening from the rear seat armrest/consol into the trunk. Officer Rhodes then searched the front seat area of the vehicle. He testified that he found drug paraphanelia in the front seat area and also found another bag containing methamphetamine in the glove compartment. After completing the search, Officer Rhodes informed Officer Carlson what he had found in the vehicle.

Officer Rhodes testified that he then proceeded to question Defendant Chacon further about the circumstances of the woman being in the trunk and what was found in the vehicle. Defendant Chacon stated that he purchased the handgun for $50.00 and that it was for protection. He stated that when he observed the officers, he slid the gun into the trunk through the opening in the backseat armrest/console. Defendant Chacon stated that Ms. Buterbaugh was his girlfriend and that her father had told Defendant Chacon that he did not want him dating his daughter. Ms. Buterbaugh did not believe this. A meeting had been or was being arranged between Defendant and the father. Ms. Buterbaugh got into the trunk so that she would be able to over hear what her father said to Defendant and then confront him. Officer Rhodes testified that after speaking with Defendant Chacon a records check was run on the Defendant and the handgun. The records check revealed that the handgun was stolen and that Defendant Chacon was still on probation for a felony conviction. Defendant was then apparently placed under arrest.

Officer Eric Carlson testified that he and Officer Urena also responded to the 7-Eleven store pursuant to the radio dispatch report. He testified that Officer Rhodes arrived shortly before or about the same time. Officer Carlson described the felony stop and seizure of Defendant consistent with the description provided by Officer Rhodes. Officer Carlson also testified that upon opening the trunk, he observed a female who was just ending a conversation on a cell phone. Officer Carlson stated that the officers ordered her out of the vehicle. The woman appeared very calm and under no distress. Officer Carlson testified that the woman was directed to the front of his patrol vehicle by Officer Urena and was placed in handcuffs. Officer Carlson testified that he was positioned between the two police patrol vehicles which were stopped several feet apart. Officer Urena was interviewing Ms. Buterbaugh and Officer Rhodes was interviewing Defendant Chacon. Officer Carlson testified that he moved closer to Officer Rhodes and Defendant Chacon and listened to the conversation between them. Officer Carlson testified that he heard Defendant Chacon's explanation why the woman had been in the trunk. Officer

4

Carlson testified that he also heard Officer Rhodes request permission from Defendant Chacon to search the vehicle and that Defendant Chacon gave verbal consent to search the vehicle. Officer Carlson testified that Officer Rhodes then proceeded to the Defendant's vehicle while Officer Carlson remained by the Defendant. Officer Rhodes looked in the trunk and told Officer Carlson that "I have a 413" meaning that he had found a gun inside the trunk. Officer Carlson also testified that Officer Rhodes read Defendant Chacon his Miranda rights. It was unclear from Officer Carlson's testimony whether he recalled this occurring before or after Officer Rhodes searched the vehicle. Officer Carlson also testified that Defendant Chacon told Officer Rhodes that he had purchased the gun for $50.00 and that he placed it in the trunk through the rear set armrest/consol opening. Officers Rhodes and Carlson both testified that they were not informed of Ms. Buterbaugh's statements to Officer Urena until after Defendant Chacon gave verbal consent to search his vehicle and Officer Rhodes discovered the gun.

       During the stop, it was determined that the registered owner of the Cadillac was Maribella Posadas. At some point, Ms. Posadas was apparently contacted by one of the officers about picking up her vehicle. During the evidentiary hearing, Defendant introduced a recording and transcript of a telephone call between the police dispatcher and Officer Michael Purcaro that occurred at 12:50 p.m. *Defendant's Exhibits "A"* and *"B."* The dispatcher asked Officer Purcaro if he was out on the subject call. After Officer Purcaro responded yes, the dispatcher advised that she had the owner of the vehicle, Maribella Posadas, calling in and she wanted to know where the vehicle was located and if she needed to come pick it up. Officer Purcaro responded: "Um, actually she can come out here and we can get a consent to search from her. That would be great. It's at Lamb and Cheyenne at the 7-11." *Defendant's Exhibit "B."* The police department "unit log" record indicates that Officer Purcaro was present at the scene by 11:40 a.m. and would therefore have been present shortly after Defendant Chacon was detained and when the handgun was found in the vehicle by Officer Rhodes.

       Officer Rhodes testified that Officer Purcaro was not actively involved in the incident. He stated that Officer Purcaro would not have been aware that he obtained Defendant Chacon's consent to search the vehicle at the time the consent was given, but that Officer Purcaro might have been informed of it during the course of the investigation. He acknowledged that Officer Purcaro may have been aware of the discovery of the gun during the search of the vehicle. Officer Rhodes had no recollection of speaking

with Officer Purcaro about obtaining the owner's consent to search the vehicle. Officer Carlson also testified that he did not recall any conversation with Officer Purcaro about obtaining the owner's consent to search the vehicle. Officer Carlson also did not recall Officer Purcaro being actively involved in the investigation.

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." *Id.* Evidence obtained in violation of the Fourth Amendment, and evidence derived from it, may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

**1.    Whether the Officers Had Reasonable Suspicion to Stop and Detain the Defendant Based on the 911 Call**:

Defendant initially challenges whether the officers had probable cause or reasonable suspicion to stop and detain him based on the 911 call. Law enforcement officers may stop and detain an individual when they have reasonable suspicion to believe that the person is engaged in or about to engage in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968). Whether information provided by an informer is sufficient to support probable cause or reasonable suspicion must be determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). *White* states that because reasonable suspicion is a less demanding standard than probable cause, it can arise from information that is less reliable than that required to show probable cause. Therefore, information provided by an informer that might not be sufficient to establish probable cause to conduct a search may be sufficient to justify a *Terry* stop. *White* further states:

> Reasonable suspicion, like probable cause, is dependent upon both the content of the information possessed by the police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more

> information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*Id.* 496 U.S. at 330.

At the time the officers ordered Defendant Chacon out of his vehicle at gunpoint and placed him in handcuffs, they had information based on a 911 call that the driver of the vehicle had been observed putting a woman in the trunk of the vehicle. There was, at that point, no other information either corroborating the caller's information or clearly indicating that a crime had occurred. The Court therefore concludes that the 911 caller's information was not sufficient to establish probable cause to arrest. The question is, however, whether it provided reasonable suspicion of criminal activity to justify the initial seizure and detention of the Defendant.

In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), an anonymous tipster called the police and stated that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Based on this information, the police went to the location and observed the defendant who matched the tipster's description. The police detained the defendant, conducted a pat down search and found a handgun on his person. The Supreme Court held that the information provided by the anonymous informer did not have sufficient indicia of reliability to provide the officers with reasonable suspicion that defendant was carrying a concealed firearm. The Court stated:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed. 1996) (distinguishing reliability as to identification, which is often important in other criminal contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases.)

529 U.S. at 27.

In *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004), the court distinguished *Florida v. J.L.* in evaluating whether an informant's tip provided in a 911 emergency call was sufficient to provide officers with reasonable suspicion to detain the defendant. In *Terry-Crespo*, an individual called 911 and reported that three minutes earlier a man had threatened him with a .45 handgun. The

informer provided a physical description of the suspect and the location where the threat had occurred. The informer also told the 911 operator that his name was "Jose Domingis."  In response to the operator's request for his phone number, however, the informer stated that he was using another person's cellular phone and did not know the return number.  He also did not provide any alternative number where he could be reached.  A police operator immediately dispatched officers to check the area where the informer had reported the threat.  The officers observed the defendant who matched the description of the suspect provided by the 911caller.  The officers detained the defendant at gunpoint and conducted a pat down search during which a .45 caliber handgun fell out of his pants.  The defendant was subsequently charged with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  Following the incident, the police were unable to find the informer "Jose Domingis."  The 911 call was recorded, however, and admitted into evidence.

In holding that the 911 call provided reasonable suspicion for the police to stop and detain the defendant, the court found certain factors which increased the reliability of the caller's information. First, the caller was not a completely anonymous tipster and was therefore entitled to greater reliability. In this regard, the court cited Justice Kennedy's concurring opinion in *Florida v. J.L.* that "[w]hile 'a tip might be anonymous in some sense, it may have certain other features either supporting reliability or narrowing the likely class of informants so that the tip does provide the lawful basis for some police action.' (citation omitted.)" *Terry-Crespo*, at 356 F.3d at 1174.  Because the caller provided his name to the 911 operator, his tip had a greater degree of reliability even though the police were unable to locate him afterwards.  The court also noted that there was nothing about the caller's identification which suggested that he was providing a false name.  The court declined to impose a duty on the police to confirm the identity of every 911 caller who provides his or her identity.  Because the 911 call was recorded and introduced in evidence, the court was also not presented with "the specter of after-the-fact, police fabrication of an 'anonymous informant.'" *Id.* at 1175.

Second, the 911 call was entitled to a greater degree of reliability because police must take 911 emergency calls seriously and respond with dispatch.  The court noted that exigent situations may limit the police's ability to gather identifying information, and that delay in attempting to verify an identity or obtain corroboration of a reported emergency may prove costly to public safety and undermine the 911

system's usefulness. *Terry-Crespo,* at 1176. The fact that the caller reported that he had just been threatened with a firearm was sufficient to constitute an emergency situation. Third, the court also noted that by providing information about his identity, the informant placed his anonymity at risk and exposed himself to possible criminal sanction for making a false report. Fourth, the call had a greater degree of reliability because it evidenced first-hand information from a crime victim laboring under the stress of recent excitement. The caller was providing information about criminal activity that had just occurred, and the caller was also seeking immediate police aid.

The 911 call in this case was at least as reliable as the call in *Terry-Crespo*. The 911 call was recorded and played during the evidentiary hearing. The caller provided his first name and his telephone number to the 911 operator. He also provided a description of the vehicle he was driving. While it is unknown to the Court whether the caller was subsequently identified by the police, he was not an anonymous tipster. By providing his telephone number to the operator, the caller exposed himself to the risk of being identified and subject to legal sanction if it was later determined that he made a false report. The caller also remained on the phone for a few minutes after he provided his phone number which provides additional indicia of his reliability. The call clearly involved an emergency situation. The caller reported that he had just seen "a guy put a woman in the trunk of a Cadillac." The caller was reporting his firsthand observation moments after it occurred and while he still engaged in following the vehicle.

The touchstone of the Fourth Amendment is reasonableness. *Terry-Crespo*, 356 F.3d a 1176. Adults do not normally get into automobile trunks voluntarily. They especially do not engage in such conduct on a summer day in Las Vegas, Nevada. The 911 caller's information that he had just seen a man put a woman in the trunk of a Cadillac therefore clearly raised reasonable suspicion that a kidnaping crime was in progress which required an immediate police response before the vehicle disappeared into traffic or the woman reported to be in the trunk suffered injury or further injury. The emergency

. . .

. . .

. . .

. . .

circumstances did not afford the police the option to investigate further before they acted. Stated otherwise, it would have been unreasonable for the police to not have responded as they did.[2]

## 2. Whether The Manner and Length of Defendant's Detention Violated the Fourth Amendment:

*United States v. Charley*, 396 F.3d 1074, 1080 (9th Cir. 2005) states that "[n]o 'litmus-paper test' exists for determining when a seizure exceeds the bounds of an investigative stop.' *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Eberle v. City of Anaheim*, 901 F.2d 814, 819 (9th Cir. 1990)." The court is, again, required to examine the totality of the circumstances in deciding whether an investigative detention has ripened into an arrest. The inquiry focuses on the perspective of the person seized, rather than on the subjective beliefs of the law enforcement officers. The question is whether a reasonable innocent person in the same circumstances would not have felt free to leave after brief questioning. *Id.*

The Supreme Court has also declined to adopt a bright line rule for how long an investigative stop based on reasonable suspicion may last before it becomes a *de facto* arrest, which must be supported by probable cause. In determining whether the length of the detention is reasonable, the court must consider whether the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly during the time it was necessary to detain the defendants. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575 (1985). In *Sharpe*, the court held that a detention

---

[2]Defendant has not contended that Officer Rhodes and Carlson acted illegally in initially opening the trunk. The officers were clearly justified in doing so as soon as they had secured Defendant Chacon. In regard to warrantless searches of premises, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 1947 (2006) states that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' (citation omitted)." Here, the police had reasonable suspicion of a possible kidnaping in progress and that the victim was in the trunk of the vehicle. The police were therefore justified in opening the trunk to free a possible victim and protect her from injury before taking other steps to investigate the circumstances. It also appears that the officers limited their initial opening of the trunk to determine if there was a woman inside and, if so, freeing her. The officers did not otherwise search the trunk at that point.

which lasted twenty minutes until the officer discovered narcotics and placed defendant under arrest was reasonable. In *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir.2005), the defendant was detained between 20 and 40 minutes before the officers determined that there was probable cause to arrest him. In holding that the length of the detention did not exceed the reasonable bounds for a *Terry* stop, the court stated that the period of detention was permissibly extended because new grounds for suspicion of criminal activity continued to unfold.

Under ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop. *United States v. Miles*, 247 F.3d 1009, 1012-13 (9th Cir. 2001), citing *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). *Miles* further states, however:

> Nevertheless, "we allow intrusive and aggressive police conduct without deeming it an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." [*Lambert*], at 1186; *accord Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("it is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable.") In determining whether a stop amounts to an arrest, we also consider the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought" and the "the number of police officers present." *Lambert*, 98 F.32d at 1189-90.

*Miles*, 247 F.3d at 1012-13.

In *United States v. Charley*, the court held that the defendant was not subjected to an unlawful arrest where the officer questioned the defendant in his patrol car. In so holding, the court cited its previous decision in *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002), that an investigative stop did not become an arrest where the officers stopped a suspect in the mistaken belief that he was a burglary suspect, ordered him out of his vehicle at gunpoint, handcuffed him and placed him in the back of their patrol car. The officers then drove the defendant to the reported scene of the crime where they confirmed that he was not the suspect. As the court in *Charley* noted:

> The district court granted summary judgment for the defendants, and we affirmed, holding that the police conduct at issue "did not exceed the bounds of a valid investigatory stop," because the purpose of the stop was for the police "to make sure that they ha[d] the right person," and cuffing the plaintiff and bringing him to the alleged crime scene was "not, under the circumstances, an unreasonable way of finding out if [the plaintiff] was the person they were looking for."

1  *Charley*, 396 F.3d at 1081.

2  In *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007), the Fourth Circuit also held that an investigatory stop did not become an unlawful arrest because the police officers detained defendant, who was reportedly armed and had made threats, at gunpoint and placed him in handcuffs.  The court stated:

> Importantly, the techniques that the officers used to effect Elston's detention were consistent with an investigatory stop under *Terry*.  Our decisions have recognized that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into custodial arrest. *Leshuk*, 65 F.3d at 1109-10.  These officers reasonably suspected that Elston was armed and dangerous and thus did not exceed the limits of a *Terry* stop by drawing their weapons and placing Elston in handcuffs.

In this case, the 911 caller reported to the operator that he had just seen a man put a woman in the trunk of a Cadillac and then drive away from the parking lot where this occurred.  Although the word "put" was ambiguous, the tone of the caller's voice and the circumstances were such as to provide reasonable suspicion that the woman had been forced into the trunk.  The dispatcher broadcast this incident to the police officers as a "zero," i.e. highest level, priority call.  Based on the information, the officers had reasonable suspicion that the driver of the Cadillac was engaged in a kidnaping and might be armed and pose a danger to the officers.  The Court also infers that there is a significant risk that a suspect will attempt to escape in such circumstances.  Under these circumstances, the officers' conduct in ordering the Defendant to exit his vehicle at gunpoint and then placing him in handcuffs was reasonable.

Upon detaining the Defendant, the officers acted promptly to open the trunk and determine if there was a woman inside.  They thereupon observed Ms. Buterbaugh lying in the trunk and engaged in a cellular telephone call.  At that point, the officers' reasonable suspicion that the woman was a kidnaping victim obviously began to dissipate.  The circumstances, however, were sufficiently unusual that it was reasonable for the officers to investigate further to determine whether Defendant had committed a crime against Ms. Buterbaugh or whether Mr. Chacon and Ms. Buterbaugh were engaged in or about to engage in some other criminal activity.

After Ms. Buterbaugh exited the trunk, Officer Rhodes returned to Defendant Chacon.  Officer Rhodes testified that he advised the Defendant of his Miranda rights because he still considered him a

1  possible kidnaping suspect.  He then informed Defendant Chacon of the reason for the stop and the
2  Defendant agreed to speak with him.  The Defendant told Officer Rhodes that there was no kidnaping
3  and that the woman had voluntarily entered the trunk.  At that point Officer Rhodes asked Defendant for
4  permission to search his vehicle and the Defendant said "go ahead."  Officer Rhodes proceeded to search
5  the vehicle whereupon he immediately discovered the gun in the trunk.  The discovery of the handgun
6  and Officer Rhodes' further discovery of what appeared to be controlled substances provided additional
7  grounds for investigation.  *United States v. Mayo, supra.*  That discovery, the further interview with the
8  Defendant and the results of the records check provided probable cause to arrest the Defendant.
9  Additionally, Officer Rhodes' discovery of what appeared to be illegal controlled substances also
10 provided probable cause to arrest.

11  It is not clear from the officers' testimony how much time passed from when Defendant was
12 initially detained until Officer Rhodes discovered the firearm in the vehicle.  It appears from the dispatch
13 log and unit log introduced into evidence, *Exhibits "I"* and *"K,"* that Officer Rhodes arrived on the
14 scene and initiated the detention at approximately 11:40 a.m.  According to the dispatch log, Defendant
15 was "Mirandized" at 11:44 a.m.  *Defendant's Exhibit "I."*  An entry in the log at 11:59 a.m. states that a
16 "413," i.e. a firearm, was found in the trunk of the vehicle.  It is not clear, however, that this was the
17 actual time at which the firearm was discovered.  Fifteen minutes appears to be longer than it would have
18 taken for Officer Rhodes to advise Defendant of his rights, advise him of the purpose of the stop, and to
19 obtain his consent to search the vehicle.  In any event, no more than 20 minutes elapsed from when the
20 detention began until the gun was found.  Based upon the totality of the circumstances, the Court
21 concludes that the police officers acted diligently in investigating their suspicions and did not
22 unreasonably prolong the detention.  The Court also finds that the measures taken by the officers,
23 including ordering Defendant to exit the vehicle at gunpoint and placing him in handcuffs, did not
24 transform the investigatory stop into a custodial arrest.

25     **3.     Whether Defendant Consented to a Search of the Vehicle and, if so, Whether His Consent Was Voluntary:**
26

27 Defendant's counsel disputes that Defendant Chacon actually gave Officer Rhodes consent to
28

search his vehicle.[3] Defendant's counsel bases his argument primarily on the recorded conversation between Officer Purcaro and the dispatcher at 12:50 p.m. in which Officer Purcaro indicated that the owner of the vehicle could come to the arrest location to pick up the vehicle "and we can get a consent to search from her." Officer Purcaro did not testify at the hearing and his reason for desiring the owner's consent to search is unknown. Defendant's counsel suggests that there was no reason for Officer Purcaro to desire the owner's permission to search the vehicle if the officers had already obtained Defendant Chacon's consent. On the other hand, the dispatch log confirms that the gun was found in the trunk at least 51 minutes before Officer Purcaro made this statement. *Defendant's Exhibit "I."* Obtaining the owner's consent to search after the incriminating evidence has already been discovered, and after Defendant was already under arrest for possession of the firearm, would not have cured a Fourth Amendment violation. One can therefore only speculate why Officer Purcaro thought it useful to obtain the vehicle owner's consent to search. Officer Purcaro's statement and the speculation arising therefrom is not sufficient to overcome Officers Rhodes and Carlson's testimony that Defendant gave his consent to search the vehicle.

      Some doubt must exist, however, when probable cause is lacking, but the police officers testify that they obtained verbal consent to search. Doubt also exists where it does not appear logical for the suspect to give consent. In this case, Defendant Chacon, a convicted felon, was presumably aware that the officers would find the poorly concealed firearm and narcotics if they searched the vehicle. Notwithstanding these doubts, Officers Rhodes and Carlson were credible witnesses. The Court does not have sufficient basis to conclude that they committed perjury. It therefore accepts their testimony that Defendant Chacon gave Officer Rhodes consent to search the vehicle.

      Having concluded that Defendant Chacon gave Officer Rhodes consent to search the vehicle, the next question is whether his consent was voluntary. A search conducted pursuant to a valid consent is constitutionally permissible. *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2004), citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether consent to search was voluntary is determined from the totality of the circumstances and it is the government's

---

[3]Defendant Chacon did not testify at the hearing.

burden to prove that the consent was freely and voluntarily given. *Id.*, citing *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Chan-Jimenez,* 125 F.3d 1324, 1327 (9th Cir.1997). The Ninth Circuit has identified five factors, none of which is individually dispositive, to determine whether a consent to search was voluntary. These factors are: (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that he had the right not to consent; and (5) whether the defendant had been told a search warrant could be obtained. *Id. See also United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007). In applying these factors, *Soriano* states:

> It is not necessary to check off all five factors, but "many of this court's decisions upholding consent as voluntary are supported by at least several of the factors." *Chan-Jimenez,* 125 F.3d at 1327 n. 3. Nevertheless, these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry. *Bustamonte,* 412 U.S. at 224, 93 S.Ct. 2041 (rejecting "talismanic definition of 'voluntariness' mechanically applicable" to all situations); *see also United States v. Morning,* 64 F.3d 531, 533 (9th Cir.1995) ("although we have established these factors to aid in the decision making process, the full richness of every encounter must be considered ... Every encounter has its own facts and its own dynamics. So does every consent").

*Soriano*, 361 F.3d at 502.

In this case, two factors support a conclusion that Defendant's consent to a search was not voluntary -- he was in handcuffs, i.e., in custody[4] and he was not notified of his right to refuse consent. The factors which support a finding of voluntariness include that Defendant was given Miranda warnings and no statement was made to Defendant that a search warrant could or would be obtained if he refused to consent. In addition, no guns were being pointed at Defendant at the time he consented to the search. As *Soriano* states, these factors are not a mechanized formula to resolve the voluntariness inquiry and the court must consider the totality of the circumstances. In *United States v. Perez-Lopez*, 348 F.3d 839, 846-47 (9th Cir. 2003), the court also questioned the significance of giving of Miranda warnings in determining whether consent was voluntary. The court noted that reliance on the Miranda factor is based on the First Circuit's decision in *United States v. Gorman*, 380 F.2d 158 (1st Cir. 1967), in which the court stated the idea that things which might be found in a search could be used against an accused was

---

[4]For the reasons set forth in the previous section, however, Defendant was not under arrest.

implicit in the warning of the right to remain silent. *Perez-Lopez* noted, however, that a defendant may not understand that Miranda warnings are equally applicable to his right to refuse to consent. The court stated that "[i]t is open to question, therefore, whether the inclusion or exclusion of Miranda warnings in a given set of circumstances should weigh much in either direction in considering voluntariness." *Id., Perez-Lopez,* 348 F.3d at 847.

Although some of the factors support a contrary conclusion, based on the totality of the circumstances, the Court finds that Defendant's consent to search the vehicle was voluntary. Prior to Officer Rhodes requesting Defendant's consent to search the vehicle, Ms. Buterbaugh had been released from the trunk. Defendant had been advised of his Miranda rights, and he had also been informed that the officers had stopped his vehicle because of a report of a possible kidnaping. Defendant agreed to speak with Officer Rhodes and advised him that the woman had voluntarily entered the trunk and there had been no kidnaping. The Court concludes that Defendant's willingness to speak with the officers and to permit them to search the vehicle in response to be informed of the reason for the stop, was a voluntary decision on his part. It was, of course, ill advised from Defendant's standpoint, since it led to the discovery of evidence that supported his arrest on other grounds.

## CONCLUSION

The Court concludes that the police officers had reasonable suspicion, based on the 911 call, to detain Defendant as a kidnaping suspect. The officers, therefore, also had reasonable suspicion that Defendant might be armed and dangerous which justified the methods used during the detention and did not transform the detention into *de facto* arrest. The length of the detention under the circumstances was reasonable. The Court also finds that Defendant gave his consent for the officer to search his vehicle and that his consent was voluntarily given. Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Motion To Suppress Evidence (#24) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within

the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 23rd day of March, 2009.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge

17